```
              UNITED STATES DISTRICT COURT
               DISTRICT OF NEW HAMPSHIRE
```

Janice Scanlon

    v.                                            Civil No. 12-cv-189-JL
                                                   Opinion No. 2013 DNH 088

Michael J. Astrue, Commissioner,
Social Security Administration

**MEMORANDUM ORDER**

Janice Scanlon has appealed the Social Security Administration's denial of her application for Social Security Disability Insurance Benefits ("DIB"). An administrative law judge at the SSA ("ALJ") ruled that, as of December 1, 2007, Scanlon was no longer disabled by a broken leg sustained in April 1998. Specifically, the ALJ found that, as of December 1, 2007, Scanlon no longer suffered from a listed impairment, 20 C.F.R. § 404.1594(c)(3)(i), so that she had experienced medical improvement related to her ability to work. The ALJ also found that, despite Scanlon's severe impairments as of December 1, 2007, including lingering symptoms of her broken leg, she had the residual functional capacity ("RFC") to perform sedentary work with some limitations, id. § 404.1594(f)(7). Based on that assessment, and the testimony of a vocational expert, the ALJ concluded, that, as of December 1, 2007, Scanlon could perform

work existing in significant numbers in the national economy, id. § 404.1594(f)(8), and, therefore, was not disabled.

The Appeals Council later denied Scanlon's request for review of the ALJ's decision, id. § 404.968(a), with the result that the ALJ's decision became the SSA's final decision on Scanlon's application,[1] id. § 404.981. Scanlon appealed the decision to this court, which has jurisdiction under 42 U.S.C. § 405(g) (Social Security).

Scanlon has filed a motion to reverse the decision. See L.R. 9.1(b)(1). Scanlon argues that, in determining her RFC, the ALJ made several errors, including (1) disregarding Scanlon's additional impairments, including cognitive limitations, (2) rejecting some of her testimony as not credible, and (3) improperly weighing conflicting reports from medical sources. The Commissioner of the SSA has cross-moved for an order affirming the ALJ's decision. See L.R. 9.1(d). The Commissioner argues that substantial evidence supports the ALJ's RFC assessment, including his subsidiary findings as to (1) Scanlon's claimed cognitive limitations, (2) her credibility, and (3) the

---

[1] While Scanlon's request for review was pending, she filed new applications for both DIB and Social Security Insurance, claiming an onset date of August 25, 2009, i.e., more than 20 months after the date at issue before the ALJ. The SSA granted these applications. At stake in this appeal, then, are Scanlon's DIB for that intervening period.

weight to give various items of conflicting evidence.  As
explained below, the court agrees with the Commissioner, and
therefore grants his motion to affirm (and denies Scanlon's
motion to reverse) the ALJ's decision.

I.  **Background**

In April 1998, Scanlon suffered major injuries--including a
broken wrist and ankle and a partial brainstem lesion--when she
drove her car off the road and into a tree.  She admitted to
drinking alcohol and taking a painkiller prior to the collision
and, in fact, had previously been admitted to the hospital for
overdosing on those substances.  In December 1998, Scanlon
applied for, and was granted, DIB based on her fractured right
tibia, which had yet to heal.

Nearly four years later, Scanlon's tibia had still not
healed, despite multiple surgeries.  In September 2002, the SSA,
conducting a review of Scanlon's disability claim, see 20 C.F.R.
§ 404.1594, found this disability to be continuing.  Based on a
subsequent review of Scanlon's claim, though, in December 2007,
the SSA determined that she was no longer disabled, noting that
Scanlon's "impairments have demonstrated medical improvement with
decrease in symptomology and increase in functional capacity."
Scanlon requested reconsideration of this decision by hearing
officer.  See id. § 404.913(b).  Following a hearing, at which

Scanlon and another witness, Marvin Evvard, testified on Scanlon's behalf, the hearing officer found that Scanlon suffered from neither a listed impairment, because "she no longer has a non-union of her fractured leg, and she is able to ambulate effectively," nor "marked functional limitations."

Scanlon then requested a hearing before an ALJ, which took place in June 2010. Scanlon, represented by counsel, appeared at the hearing, testified on her own behalf, and called Evvard (her employer, housemate, and friend) as a witness. At the hearing, Scanlon testified that, since 2003, she had been working in Evvard's dental office, checking messages and answering the phone, scheduling appointments, and retrieving patient files. She usually worked from 10 a.m. to 2 p.m. on Tuesday, Thursday, and Friday, though she tried to work a shorter shift on Fridays, if possible. She explained that her hours varied depending on how she was feeling and what was "going on with the patients."

The ALJ subsequently issued a written decision, finding that, as of December 1, 2007, Scanlon was no longer disabled. The ALJ recognized (as noted supra) that Scanlon had been found to have a continuing disability as of September 2002, when she was suffering from her still-unhealed broken ankle, as well as a back sprain. The ALJ also recognized that, since December 1, 2007, Scanlon had not engaged in substantial gainful activity,

see id. § 404.1594(f)(1), and had been suffering from a number of medically determinable impairments, including: residual symptoms of the fracture, and osteoarthritis, in her right ankle; degenerative disc disease of her cervical spine; "shoulder and wrist impairments"; and degenerative joint disease in her left knee. But the ALJ ruled that these impairments, either alone or in conjunction, did not meet or equal the severity of any listed impairment. See id. § 404.1594(f)(2).

The ALJ next found that, in the time since Scanlon was deemed to be suffering from a continuing disability in September 2002, there had been medical improvement, i.e., a decrease in the medical severity of her impairments. See id. § 404.1594(b)(1). Specifically, the ALJ found that, as of December 1, 2007, Scanlon's "tibial fracture had healed, and she was able to walk without a limp . . . . In 2008, she reported that she was able to stand almost all day with the use of a brace." The ALJ went on to find that this medical improvement was related to Scanlon's ability to work, see id. § 404.1594(f)(4), since, as just noted, she no longer suffered from the listed impairments that had supported the most recent finding of her continuing disability.

Because, as also just noted, Scanlon had a number of severe (but non-listed) impairments, see id. § 404.1594(f)(6), the ALJ proceeded to consider Scanlon's RFC in light of them, see id.

§ 404.1594(f)(7). The ALJ found that, as of December 1, 2007, Scanlon had the RFC to perform sedentary work with some limitations. While the ALJ found that this left Scanlon unable to perform her past relevant work, the ALJ also found, based on the testimony of a vocational expert, that Scanlon could do other work, see id. § 404.1594(f)(8), existing in significant numbers in the national economy. Specifically, the ALJ found that, despite Scanlon's limitations as reflected by her RFC, she could perform the job requirements of an order clerk, a stuffer, or a credit authorizer. So the ALJ concluded that Scanlon was no longer disabled as of December 1, 2007.

## II. Analysis

As noted at the outset, Scanlon identifies three principal errors in the ALJ's analysis of Scanlon's RFC. As an initial matter, however, Scanlon seems to argue that the ALJ erred as a matter of law by finding that Scanlon had experienced medical improvement since she was last deemed disabled without also finding that her RFC had increased in the interim. This argument mistakenly conflates distinct steps of the test for continuing disability under 20 C.F.R. § 404.1594.

"Medical improvement is any decrease in the medical severity of [the applicant's] impairments which was present at the time of the most recent medical decision that [she] was disabled or

continued to be disabled." Id. § 404.1594(b)(1). Again, the last decision that Scanlon suffered from a continuing disability was in September 2002. As the ALJ found, between then and December 1, 2007, Scanlon's "tibial fracture had healed," which meant that she no longer suffered from the listed impairment that triggered the earlier finding of continuing disability. Contrary to Scanlon's suggestion, no additional finding was necessary for the ALJ to conclude that Scanlon had experienced "medical improvement"--the ALJ did not also need to find "an increase in the RFC." Indeed, because Scanlon had been previously found disabled due to a listed impairment, her RFC had not even been determined at that point. As 20 C.F.R. § 404.1594(c)(3)(i) says:

> If our most recent favorable decision was based on the fact that your impairment(s) at the time met or equaled the severity contemplated by the Listing . . . an assessment of your [RFC] would not have been made . . . . <u>If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work.</u> We must, of course, also establish that you can currently engage in gainful activity before finding that your disability has ended.

(emphasis added). The ALJ followed this provision in ruling that, because Scanlon no longer suffered from the listed impairment that existed when she was last found disabled, she had experienced medical improvement related to her ability to work. While, of course, the ALJ needed to assess Scanlon's RFC as of

7

December 2007--which he did--he did not need to "compare" that RFC to her RFC as of September 2002 (again, her RFC at that point was never determined).

### A. Cognitive limitations

Scanlon argues that the ALJ improperly found that, while Scanlon "may need to be reminded of more complex tasks once per day," she "is able to understand, remember, and carry out moderately complex instructions." Scanlon claims that "[t]here is no evidence she has this capability and much of the evidence contradicts it," but that the ALJ "simply ignore[d]" that conflicting evidence. The court disagrees.

As the Commissioner points out, "[i]f the only medical findings in the record suggest[] that a claimant exhibited little in the way of [cognitive] impairments," an ALJ is "permitted to reach that [] conclusion himself." Gordlis v. Sec'y of Health & Humans Servs., 921 F.2d 327, 329 (1st Cir. 1990). That is the state of the record here. The only reference in Scanlon's medical records to any cognitive limitations is in the report of an orthopedic examination, conducted in August 1999, noting "cognitive function changes" as the result of a "cerebrovascular accident or stroke" that Scanlon suffered after her April 1998 car crash. The orthopedist who wrote this report offered that "[t]here may also be cognitive functioning deficits which would

interfere with work activities." Importantly, however, this statement was based entirely on Scanlon's complaint that "[s]he was aware of cognitive function changes, specifically, difficulties in comprehension of spoken conversation and also difficulties in depth perception."

Scanlon faults the ALJ for ignoring this report in finding that Scanlon could handle moderately complex instructions as of December 2007. She does not explain, though, how that finding is at odds with her orthopedist's report of Scanlon's difficulties with spoken conversation and depth perception[2]--rather than with her ability "to understand, remember, and carry out moderately complex instructions."

Indeed, Scanlon identifies nothing in her medical records identifying any problems with memory or concentration. To the contrary, as the Commissioner points out, a psychologist who evaluated Scanlon in May 1999 (a year or so after the accident,

---

[2]It is worth noting, as the Commissioner does, that the orthopedist's statement that Scanlon was having such difficulties was based entirely on her complaint of them. An ALJ need not give great weight to a physician's "narratives [that] rely more on [the claimant's] subjective reports to [the physician] than they rely on [his or her] own observations or clinical findings." Hobart v. Astrue, No. 11-151, 2012 WL 832883, at *9 (D.N.H. Feb. 9, 2012) (McCafferty, M.J.), rep't & rec. adopted, 2012 WL 832841 (D.N.H. Mar. 9, 2012). That is the case with the August 1999 report which, after all, was prepared by an orthopedist, not a neurologist or psychologist.

and just a few months before the orthopedist's report) found that she "appear[ed] to be able to think abstractly and sequentially" and "to focus well and apply herself to common tasks without significant difficulty." The psychologist concluded, in fact, that Scanlon was "functioning in the average range in all the cognitive areas probed." Again, Scanlon points to nothing in her medical records suggesting that her cognitive functioning worsened between that examination and December 2007. There was substantial evidence to support the ALJ's finding that, as of then, Scanlon was "able to understand, remember, and carry out moderately complex instructions."[3]

### B. Credibility of Scanlon's statements

Scanlon also claims that the ALJ erred in assessing Scanlon's statements that she suffered from functional limitations. As Scanlon notes, an ALJ must evaluate such statements according to SSR 96-7p, Titles II and XVI: Evaluation

---

[3] As evidence of her cognitive limitations, Scanlon also relies on Evvard's testimony at the hearing that Scanlon "made many mistakes" in her work for him, including errors in scheduling appointments and completing insurance forms. Scanlon suggests that the ALJ "ignored" this testimony or, at a minimum, summarily rejected it. In fact, the ALJ specifically noted Evvard's testimony as to Scanlon's mistakes at work, but deemed it not credible as to "the intensity, persistence and limiting effects" of Scanlon's symptoms because, as just discussed, "there is no indication in the record that [Scanlon] ever mentioned mental health symptoms to her treating physicians." This was not error. See Moss v. Astrue, 2011 DNH 064, 48-49.

of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (S.S.A. 1996).  SSR 96-7p "outlines a specific staged inquiry that consists of the following questions, in the following order:  (1) does the claimant have an underlying impairment that could produce the symptoms he or she claims?; (2) if so, are the claimant's statements about his or her symptoms substantiated by objective medical evidence?; and (3) if not, are the claimant's statements about those symptoms credible?"  Griffiths v. Astrue, No. 11-cv-195, 2012 WL 1565395 at *9 (D.N.H. Apr. 3, 2012) (citations omitted), rept. & rec. adopted, 2012 WL 1557846 (D.N.H. May 2, 2012).  The ALJ properly followed this procedure in finding that Scanlon's testimony as to the limiting effects of her pain was not entirely credible.

Scanlon testified to what the ALJ called "constant pain" in the leg she had broken in the accident, as well as "all day" numbness throughout her foot that causes her to trip, fall, and injure herself "all the time" when encountering a stair.  She also testified to what the ALJ called "pain in her neck, left arm and shoulder," and, especially, her right wrist, which, she said, "doesn't move right.  When I try to move it at all . . . , it'll hurt for a really long time."  The ALJ also noted Scanlon's testimony that she used crutches to get around at home, and

"could walk only the length of the hearing room without having to sit, and could stand for only 10 minutes." Scanlon points to her additional testimony that, when she tried to assist Evvard in performing dental procedures on patients, she would be "sitting there saying, ow, ow, ow."

While the ALJ found that Scanlon's "medically determinable impairments could have reasonably been expected to produce these alleged symptoms," he also found that "[i]n terms of [Scanlon's] allegedly disabling level of pain, the medical records fail to fully support the allegations." The ALJ went on to find that Scanlon's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment for the reasons explained" in the balance of his written analysis of her RFC.

Scanlon argues that the ALJ's analysis suffers from two flaws. First, Scanlon says that because she "demonstrated that objective medical evidence supports her [claimed] symptoms," the ALJ's "credibility analysis was unwarranted and unnecessary." But it is "entirely appropriate for [the ALJ] to proceed to address [a claimant's] credibility" in the face of "substantial evidence that [her] allegations of totally disabling . . . pain [are] not fully substantiated by the objective medical evidence."

Widlund v. Astrue, No. 11-cv-371, 2012 WL 1676990, at *16 (D.N.H. Apr. 16, 2012) (McCafferty, M.J.), rept. & rec. adopted, 2012 WL 1676984 (D.N.H. May 14, 2012).  Here, the ALJ noted that, at Scanlon's appointments with her orthopedist throughout 2007, Scanlon's right leg "revealed only some mild tenderness," and she "walked without a limp . . . and painless range of motion of both hips," as well as a "normal cervical range of motion, [and] normal strength sensation and reflexes in the upper extremities." The ALJ thus "documented the objective medical evidence that [he] found contradicted [Scanlon's] statements about the severity of her symptoms" and "followed the process provided by SSR 96-7p." Martel v. Astrue, No. 11-cv-214, 2012 WL 4027032, at *6 (D.N.H. Sept. 12, 2012) (DiClerico, J.).

Second, Scanlon argues that, while the ALJ "attempted to evaluate [Scanlon's] credibility" in accordance with the governing law, "the rationale he gave for finding her not credible was not reasonable, and was not based on substantial evidence or was based on a misunderstanding of the facts."  The court disagrees.

Again, the ALJ found that Scanlon's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

[RFC] assessment for the reasons explained" in the balance of the ALJ's written analysis of her RFC. These reasons included that:

- after December 2007, Scanlon "made very few complaints of pain or other limitations" and "most of [these] complaints were often accompanied by her statements regarding her participation in fairly high exertion activities";

- Scanlon's medical records "indicate little or no treatment in 2008, 2009, and 2010";

- in October 2007, Scanlon "stated that she was performing gardening and harvesting her crop";

- in June 2008, Scanlon told a physical therapist who examined her that "her ankle brace allowed her to be on her feet for almost an entire day"; and

- also in June 2008, Scanlon reported, to the same physical therapist, "fairly extensive activities of daily living" including that she "lived alone in a house that required 14 stairs to access" and "was able to drive, work for 5 to 6 hours on 3 days per week, perform her own household chores, and care for multiple pets," as well as that "she has no trouble with personal care needs, and that she is able to cook meals and is able to shop for groceries in long, twice monthly trips" and "visit friends, family, and neighbors on a monthly basis."

So the ALJ disbelieved Scanlon's complaints of disabling pain insofar as they were inconsistent with her medical records, including her reports to her medical providers. This was not error. SSR 96-7p specifically provides, in fact, that "[o]ne strong indication of the credibility of an individual's statements is their consistency . . . with other information in the case record . . . . Especially important are statements made

14

to treating or examining medical sources and to . . . other sources," including therapists. 1996 WL 374186, at *5.

Furthermore, while an ALJ should "determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects," id., it does not appear that Scanlon offered any such explanations at the hearing. Nor does Scanlon, even at this point, identify anything in the record that convincingly explains the considerable differences between her reports to her medical providers and her testimony at the hearing. Instead, in a lengthy section of her memorandum in support of her motion to reverse the ALJ's decision,[4] Scanlon attempts to explain away her statements to her medical providers (for example, as to her particularly damaging statements to the physical therapist in June 2008 that Scanlon "worked 5 to 6 hours a day, 3 days a week, lived by herself, cared for multiple pets, and had the ability to be on her right foot all day due to an

---

[4] Much of Scanlon's argument here seems to assume that the ALJ was bound to credit Scanlon's (and to a lesser extent Evvard's) testimony at the hearing, particularly as to her daily activities (for example, Scanlon argues that her daily activities are "so very minimal that they could not reasonabl[y] lead anyone to believe that she could perform full time work," but that argument is based on her activities as she described them in her testimony to the ALJ, rather than in her reports to her providers). That assumption is obviously at odds with SSR 96-7p, which, again, requires the ALJ to evaluate the credibility of a claimant's testimony about her symptoms and their limiting effect in light of all the other evidence of record, rather than to simply accept the testimony as true.

ankle brace," she argues that she "simply misspoke or [the physical therapist] misunderstood").

Even putting aside the fact that, as just noted, Scanlon never provided these "explanations" in her testimony to the ALJ, he would not have been required to accept them even if she had. See Widlund, 2012 WL 1676990, at *17 (declining to fault the ALJ "for being unpersuaded" by claimant's efforts at the hearing to attribute her account of her symptoms from her medical records to "confusing" questions). The ALJ supportably found that Scanlon's description of her symptoms at the hearing--constant pain and numbness in her right leg that left her unable to walk more than the length of a room without resting, to stand for more than 10 minutes at a time, to negotiate a stair without falling and injuring herself, or to sit without crying out in pain--was not fully credible.[5]

**C. Medical opinions**

Scanlon also makes the familiar argument that the ALJ erred by giving too little weight to the opinions of her primary care

---

[5]The same conclusion applies, for the same reasons, to the ALJ's finding that, while Scanlon "may have some minor limitations in concentration or memory due to the effects of limitations," her complaints of more serious problems with memory, focus, and anxiety were not credible. As already discussed, there is no objective medical evidence to support such symptoms, and "no indication in the record that [Scanlon] ever mentioned mental health symptoms to her treating physicians."

16

physician, in her case, Dr. Terry Bennett.  As the ALJ noted, Bennett opined, in April 1998, that Scanlon suffered from a number of functional limitations, including that she could sit for only two hours, and walk or stand for only one or two hours, during an eight-hour workday, as well as that she required "crutches to ambulate up to two days per week" and "the option to elevate her legs as often as possible."  Bennett also opined that Scanlon "could never perform any postural activities aside from stooping" and that she "could rarely reach overhead, feel, or push or pull."  The ALJ gave these opinions "little weight, as they are not supported by the record."

An ALJ must give controlling weight to the opinions of a treating physician only "[i]f [the ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and the severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [his] case record."  20 C.F.R. § 416.927(c)(2).  Here, there was substantial evidence contradicting Bennett's view, including Scanlon's June 2008 report to the physical therapist, Ernest Roy, that Scanlon was engaged in significant daily activities (as already discussed).  In assessing whether a treating source's opinion is consistent with the record, an ALJ is of course free

17

to consider the claimant's contrary statements to other medical providers.  See, e.g., Chapin v. Astrue, 2012 DNH 177, 5-6.

In addition to Scanlon's statements to Roy, the ALJ also relied on the results of the functional capacity testing that Roy performed.  Based on this testing, Roy concluded that Scanlon "was able to maintain standing for up to 60 minutes at one time," that she "had unlimited sitting tolerance," and that she "was capable of occasional couching [sic] and frequent stooping" and "frequent grasping and fingering."[6]  Roy further concluded that Scanlon's "cervical and lumbar range of motion [was] within normal limits" and that her "lifting capacity fell within the medium capacity range."

Scanlon, citing two medical journal articles and the website of a medical testing company, argues that the results of the

---

[6] Scanlon argues that Roy's opinion as to her ability to use her hands contradicts the January 2008 opinion of her orthopedist, Dr. Ingvars Vittands--an opinion that the ALJ nevertheless gave "substantial weight" as "fairly consistent with the evidence of record."  Vittands opined that Scanlon "would have difficulty with any work that involved repetitive and lengthy use of the upper extremities."  As Vittands noted, however, this restriction arose from Scanlon's "problems with her neck mostly in the form of tendinitis involving the posterior neck muscles."  Scanlon does not explain why the presence of that condition, and the accompanying restriction on the use of her "upper extremities," required the ALJ to find Scanlon incapable of "frequent grasping and fingering," and that proposition is not apparent to the court.  Cf. Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) ("frequent reaching and handling requirements are not the same as repetitive use of the [] hand").

functional capacity testing "should not even have been admitted into evidence as there is no evidence [such testing] has any scientific validity," largely because it uses the subject's performance on 90 minutes' worth of testing to assess her ability to perform over a 40-hour work week.  The ALJ, however, rejected this argument, explaining that "such evaluations are generally well-accepted as fair indicators of functional capacity."  As this court has recognized, it is more or less up to the ALJ to decide how much weight to put on functional capacity testing, so long as he states "at least some of the reasons" for that decision.  Ferland v. Astrue, 2011 DNH 169, 16 (McAuliffe, J.). (quotation marks and bracketing omitted).  The ALJ acted within his discretion, then, by placing "substantial weight" on the results of Roy's testing because, as the ALJ specifically noted, the testing "was rather comprehensive," consisting of "a full battery of testing with objective measures and evaluations," as well as because the results were "fairly consistent" with what Scanlon had told Roy about her own daily activities.

As the court of appeals has held, conflicts between the opinions of the claimant's treating physician and those of an independent examiner are for the ALJ to resolve, and the resolution will not be disturbed on appeal so long as it has substantial support in the record.  Tremblay v. Sec'y of Health &

19

Human Servs., 676 F.2d 11, 12 (1st Cir. 1982) (citing Richardson v. Perales, 402 U.S. 389 (1971)).  For the reasons just discussed, Roy's report, consisting of both Scanlon's account of her daily activities and the results of the functional capacity testing, constitutes substantial evidence supporting the ALJ's decision not to give controlling weight, but to give only little weight, to Bennett's opinions.

### III. Conclusion

Based on the foregoing, Scanlon's motion to reverse the ALJ's decision[7] is DENIED, and the Commissioner's motion to affirm that decision[8] is GRANTED.  See 42 U.S.C. § 405(g).  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 25, 2013

cc:  Elizabeth R. Jones, Esq.
     T. David Plourde, AUSA

---

[7] Document no. 8.

[8] Document no. 10.

20